**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

FILED

01 OCT 23 PH 4:43

...D OF ALABAMA

| | | |
|---|---|---|
| PAULETTE PERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-99-S-2516-S |
| | ) | |
| PELL CITY SCHOOL SYSTEM, | ) | |
| et al., | ) | |
| | ) | ENTERED |
| Defendants. | ) | |

OCT 23 2001

### MEMORANDUM OPINION

Paulette Perry claims that she was subjected to unlawful discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* She alleges that her employer, the Pell City Board of Education, subjected her to a sexually hostile work environment, that an employee of the Board demanded sexual favors to consider her for another position with the school system, and that she was subjected to retaliation for asserting her federally protected rights. She also has asserted state law claims of negligent supervision, retention, and training against the Board. Finally, Perry asserts state law claims of invasion of privacy, assault and battery, and the tort of outrage against her three harassers, Billy Adams, Lewis Kirksey, and Foster Drummonds. The action presently is before the court on motions for summary judgment by the individual defendants and Board. Upon consideration of the pleadings, the defendants' evidentiary submissions, the plaintiff's affidavit in opposition to summary judgment, and briefs of counsel, this court concludes the motions are due to be granted.

### I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and



admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See generally id.* at 323, 106 S.Ct. at 2553; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The movant discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-movant's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex Corporation*, 477 U.S. at 324, 106 S.Ct. at 2553.

When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593. The nonmoving party must put forth more than a "mere 'scintilla'" of evidence; instead, "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere

2

general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted).  Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988).  A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).  The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

## II. SUMMARY OF FACTS

Paulette Perry began her employment with the Pell City Board of Education in 1988, as a substitute school bus driver.[1]  She accepted a full-time driver position in 1992 or 1993.  She still is employed in that capacity.[2]  She is responsible for transporting students to-and-from school (and, sometimes, off-campus functions) in a safe manner, while maintaining discipline on her bus.[3]  While so employed, plaintiff was sexually harassed by three male employees of the Board:  Billy Adams,

---

[1] Defendant Pell City Board of Education's evidentiary submission (doc. no. 30), Exhibit 10 (plaintiff's first deposition), at 50-51.

[2] *Id.*

[3] *Id.*, Exhibit 40 (job description).

3

Lewis Kirksey, and Foster Drummonds.

## A.   The Individual Defendants

Billy Adams was employed by the Board as a bus shop mechanic from 1994 to September 29, 1998.[4]

Lewis Kirksey has been an employee of the Board for more than 29 years. At all times relevant to this action, he served as foreman of the bus shop. In that position, Kirksey was the immediate supervisor of all mechanics, including Billy Adams.[5] Although Kirksey's interaction with school bus *drivers* typically was limited to those instances in which a driver experienced mechanical problems with his or her vehicle, Kirksey occasionally would drive a bus to school football games and, during those trips, he would supervise other bus drivers.[6] As shop foreman, Kirksey reports directly to the Board's transportation supervisor.[7]

Foster Drummonds was employed by the Board as "director of support services" between 1992 and July 9, 1998.[8] In that position, Drummonds supervised the Board's maintenance and transportation departments, including direct supervisory authority over the bus shop foreman (Kirksey) and individual bus drivers such as plaintiff.[9] Over time, the Board determined that the responsibilities of the director of support services were too great for one individual. This led the Board to divide the duties between two new positions: "transportation supervisor" and "maintenance supervisor."[10] Drummonds was appointed maintenance supervisor, and Della Baker

---

[4] *Id.*, Exhibit 1 (Adams deposition), at 10.

[5] *Id.*, Exhibit 4 (Drummonds deposition), at 130.

[6] *Id.*, Exhibit 8 (Kirksey deposition), at 23.

[7] *Id.*, at 11-12.

[8] *Id.*, Exhibit 4 (Drummonds deposition), at 14-15.

[9] *Id.* at 15. Prior to 1992, Drummonds had acted solely as the Board's maintenance director.

[10] *Id.*, Exhibit 9 (Nicholson deposition), at 41.

4

was hired as transportation supervisor on July 9, 1998.[11] After that date, Drummonds possessed no supervisory authority over Billy Adams, Lewis Kirksey, or plaintiff.

## B.   Plaintiff's Sexual Harassment Claims

### 1.   Billy Adams

Billy Adams loitered about plaintiff's bus on a regular basis during 1997 and 1998. He frequently left "Big Red" chewing gum and handwritten notes on the driver's seat. These notes included statements such as, "Hi, bright eyes, I love you," "You are beautiful," "Hey beautiful," "I love you," and "If you let me have one chance with you, you would want another."[12] Adams sometimes left gifts for plaintiff, such as artificial roses, an occasional candy bar and, on one occasion, a plaque containing a poem entitled "I Love You."[13]

Plaintiff asked Adams to stop, but he said that he couldn't help his feelings for her.[14] She complained to Foster Drummonds about Adams' behavior several times in 1997 and early 1998.[15] Drummonds usually just laughed and made jokes about Adams' conduct,[16] but eventually said he would take care of the situation. Adams' behavior did not change.[17]

---

[11] *Id.* at 41-42; Exhibit 4 (Drummonds deposition), at 16-17.

[12] *Id.*, Exhibit 10 (plaintiff's first deposition), at 24.

[13] *Id.* at 9. Adams testified that plaintiff encouraged this behavior by calling him from home. *Id.*, Exhibit 1 (Adams deposition), at 24-25, 48-49. Adams said that plaintiff also left him gifts of candy and stuffed animals. Adams kept these tokens of perceived affection at home, until his wife discovered them. *Id.* at 54, 56. According to Adams, plaintiff also told him on one occasion that she "loved" him. *Id.*, at 84.

[14] *Id.*, Exhibit 10 (plaintiff's first deposition), at 16.

[15] *Id.* at 17-18.

[16] *Id.* at 17.

[17] *Id.* at 18-19. Although Drummonds testified that he only recalled one complaint by plaintiff, which related to the fact that Adams was "bothering her," he claims that he responded to her complaint. *Id.*, Exhibit 4 (Drummonds deposition), at 125. Drummonds eventually spoke to Kirksey, Adams' immediate supervisor, about the complaint. *Id.* at 130. Kirksey gave Adams an oral reprimand and reported this fact to Drummonds. *Id.*, Exhibit 8 (Kirksey deposition), at 85-86. Subsequent to these events, Drummonds heard that Adams had professed his love for plaintiff to his wife. Drummonds approached plaintiff and asked her about this rumor. According to Drummonds, plaintiff "didn't seem to be upset about it" and "didn't lodge a complaint about it when" he discussed it with her. *Id.*, Exhibit 4 (Drummonds deposition), at 150.

On September 16, 1998, more than two months *after* Della Baker had been appointed supervisor of transportation, plaintiff complained to her about Adams' unwelcome attention.[18] Baker promptly contacted Dr. Donna Nicholson, the Superintendent of Education, who in turn arranged a meeting for plaintiff to detail her complaints to Baker and Deloris Frazier, the Board's Title IX officer.[19] Plaintiff was asked to submit a written statement in preparation for the meeting. Her statement, submitted on September 18, 1998, related only that Adams "has left this gum on my bus on many occasions, I've asked him not to do this, but he continues to do so."[20] No mention was made of other objectionable behavior by Adams or any other Board employee, specifically neither Lewis Kirksey nor Foster Drummonds.

Plaintiff failed to attend the first scheduled meeting with Della Baker and Deloris Frazier.[21] She eventually was interviewed — along with Billy Adams, Lester Rich, Lewis Kirksey, and John Hendrix — on September 22, 1998.[22] Frazier's notes of plaintiff's responses to questions asked during that meeting read as follows:

1.  Question:  How are you feeling at this time?
    Answer:   Okay, I guess.

2.  Question:  Is something bothering you?
    Answer:   Billy [Adams] is being excessively attentive.  He comes to bus and want [sic] move in the evenings at Duran Main Campus.  Kids and drivers think he's my boyfriend.

3.  Q.  What is concerning you?
    A.  What  people  are  thinking  and  feeling  toward  me,  like  Foster

---

[18] *Id.*, Exhibit 2 (Baker deposition), at 50-51.  Baker testified that plaintiff submitted a written statement on September 18, 1998, "about two days after she originally" complained about Billy Adams' conduct.  *Id.* at 63; *see also id.*, Exhibit 18 (plaintiff's September 18, 1998, handwritten complaint).

[19] *Id.*, Exhibit 9 (Nicholson deposition), at 99-100.

[20] *Id.*, Exhibit 18 (plaintiff's September 18, 1998, handwritten complaint).

[21] *Id.*, Exhibit 2, (Baker deposition), at 63.  The record does not indicate the date for which this initial meeting was scheduled.

[22] *Id.*, Exhibit 50 (Summary notes from interviews of September 22, 1998).

[Drummonds], the kids, mechanics[, and Lewis] Kirksey.

4.   Q. What happened?
A. Two years Billy gives me chewing gum, *sexual remarks*, *letter stating wanting to have sex*. Gave letter to Paulette himself *talking about oral sex*. Showed to sister's (Bonnie) husband Danny.

Q. Have you asked him to stop?
A. He said "*if I would give him one night in bed I would not regret it. He would try so many things, I would have to like one of them. He said he could eat me from head to toe and told me what it would feel like*.["] Kirksey heard him last year.

*Kirksey tried to set up dates*. Billy has driven by my house, left messages on the answering machine (*Kirksey gave him phone number*). He would tell me to call him back. He call[s] once in a while.

5.   Q. Where did it happen?
A. Phone call at my home. He gave me notes on big red chewing gum. Mechanics had chewing gum. (Lester, John, Brutus) He would leave in seat side pocket, hand delivered. *Kirksey asked Billy to come on a trip twice*. Terry, husband rode with Pat, her request. Lester first time approached Paulette said Kirksey brought along boyfriend. Kirksey said he had plans for her. She stayed away. Sat with Lester and Bonnie whole game. Foster [Drummonds] told her he would speak with Kirksey. She stated, "Foster you'd better stop it. I mean it. Not aware if Foster talked with Kirksey."

6.   Q. Where did it happen?
A. This happened at the Talladega ball game, it also happened most everyday (evening)

7.   Q. Who saw or heard what happened?
A. Kirksey and Foster.

8.   Q. What documentary evidence or other evidence do you have?
A. "One note, chewing gum everyday or every other, phone call to home twice or three time a day (sometimes 7:00 or 8:00 PM at night." "He says bright eyes I'm thinking about you, didn't see you today, you didn't return my call." "Kirksey would call sometimes, the[n] put Bill[y] on the phone." "Then Kirksey laugh like it's a joke."

"November of 1997 Billy wanted to try to pick me up (physically), he grabed [sic] me trying to hold me, I got away, holloworing [sic] for Kirksey to help." "Kirksey laughed[."]

9.   Q. How did you feel?

7

A. "Upsetting, ignored, give excuses." "I say he will gewt [sic] in trouble, don't do this.["] Billy said, "Went home and told wife he was in love with me end of last year." "Wife pregnant with third child."

"Kirksey feels Billy is not right." "Kirksey told me what Billy said to me.["] Kirksey said, "If I ever give him (Billy) some it's no telling what he would have done." "Kirksey asked if Billy could go get buses aligned in Anniston." "Keep buses an hour ar [sic] two, give us a chance to go to motel." "Kirksey said this last year at the end of year."

"Billy called from Mobile transportation conference, June 9-10, 1998, gave room number on voice box." "It said thinking of you, give him a call,"

10.    Q.  Did you tell anyone about about [sic] the incidents?
       A.  "Last year I told my sister — Bonnie Howell ("don't want want [sic] her interviewed if you don't have to), Lewis Kirksey, Foster Drummonds, Crystal Perry (daughter). This year, I told Della Baker (9-98), John Hendrix, Brutus McClunney and Lester Rich.

11.    Q.  How did the alleged perpetrator's remarks/actions affect you?
       A.  Went to doctor/Dr. Maddix, couldn't sleep — depressed-medication/ Didn't want to leave home. Didn't want to come to work. Wouldn't turn paper work in. Embarrassing (talk, public eye, try stay away). Hadn't talk [sic] to Kirksey all year (like normally would). Feel been betrayed, made fun of, self esteem, pride torn down. Had to go to board to sign papers and pick up check. Foster asked why staying away? Why don't you come around?

12.    Q.  How did you act? Did you experience any change in behavior?
       A.  Ignored talk. Changes in behavior were headaches, gained fifteen pounds, no energy.

13.    Q.  Did you miss any work/school days?
       A.  Took off for headaches, not counting surgery. Drive to work, go home rest, come back and drive bus unless on medication (Zoloft a prescription medication tylenol, 4-6 a day, etc.)

14.    Q.  Did you go to the doctor?
       A.  Yes

15.    Q.  For what?
       A.  Went because sleep too much. Doctor told me I was depressed amune [sic] system down low.

16.    Q.  Has your work been affected?
       A.  Work affected (rob[b]ed of pride), didn't want to do anything. Kirksey

8

thought it was funny.

17.  Q. Have you spoken to anyone about how you have been feeling after the incidents?
A. [T]alked to mother — Betty Hellbourn, Terry Perry.

Q. Anyone else?
A. Yes, but choose not to say whom.

18.  Q. How do you want the situation handled?
A. Want it stopped. Want feelings understood and stop it.

19.  Q. What assistance can we provide?
A. Know Billy not well.

20.  Q. Is there any temporary/immediate action you believe is necessary?
A. [No recorded response.][23]

Plaintiff testified that, following the investigation conducted by Baker and Frazier on September 22, 1998, she experienced no further harassment from any employee of the Board.[24]

Curiously, although Frazier's notes record that plaintiff complained that Adams had made sexually explicit statements, both orally and in writing (see plaintiff's responses to the two questions numbered "4" above), during deposition plaintiff specifically denied that Adams had ever said anything "offensive," or of a "sexually harassing nature."

Q.  With regard to Billy Adams, other than making these gifts of gum and flowers and the plaque that we described, did Billy Adams do anything else of an offensive nature toward you?

A.  No. Billy — no, sir, he didn't.

Q.  Generally, is he a courteous person?

A.  Yes, sir, he's — I don't know whether I need to say it or not. He's a little slow. And, no, he didn't.

...

---

[23] *Id.* at 1-4 (emphasis supplied).

[24] *Id.*, Exhibit 10 (plaintiff's first deposition), at 31, 33-35.

9

Q.      All right. Did he ever say anything to you of an offensive, sexually harassing nature?

MR. BEARDEN: Object to the form

A.      No.

Q.      What he did was always an affectionate response?

A.      Yes.

...

He wouldn't say nothing out of the way, though. We would talk about the weather, but it was just knowing the way. That's why I said he's a little slow, you know.[25]

In any event, based on plaintiff's complaint and the interviews conducted by Baker and Frazier, Dr. Nicholson suspended Adams on September 28, 1998.[26] The following day, Adams submitted a letter of resignation.[27] He has not been employed by the Board since that date.

**2.      Lewis Kirksey**

Deloris Frazier's notes of plaintiff's September 22, 1998 interview record that plaintiff complained about Lewis Kirksey's encouragement of Billy Adams' behavior: *e.g.*, "Kirksey tried to set up dates"; "Kirksey gave him [plaintiff's] phone number"; "Kirksey laughed"; and Kirksey suggested that plaintiff and Adams drive buses to Anniston for alignment and, while that was being done, it "would give us a chance to go to [a] motel."

During deposition, plaintiff reiterated some of those same complaints, saying that Kirksey encouraged her to "date" Adams and, on one occasion, proposed that she and Adams share a hotel

---

[25] *Id.* at 112.

[26] *Id.*, Exhibit 19 (Adams' suspension letter).

[27] *Id.*, Exhibit 20 (Adams' resignation).

10

room.[28]  Kirksey also said she should "give Billy a little bit," because "he was going crazy."[29]

Significantly, plaintiff testified that Kirksey made similar statements with regard to Foster

Drummonds, proposing that plaintiff also "give some" to him,[30] and encouraging her to meet

Drummonds at a rental house owned by Kirksey.[31]

In "early" 1998, Kirksey's remarks became more personal.  He told plaintiff that he "could

eat [her] in more ways than one if [she] would let him,"[32] and that he would "talk about [plaintiff's]

legs if [she] wore shorts."[33]  On one occasion, Kirksey kissed plaintiff in his office.[34]

Plaintiff testified that she did not complain to Drummonds about Kirksey's behavior, because

they "were real good friends."[35]

However, the Board's sexual harassment policy in place at the time did not require that

plaintiff report the harassment to Drummonds, but allowed her to go around him.  The policy

provided:

> An[y] question or individual complaints involving sexual harassment should
> be referred to the immediate supervisor *and the Superintendent immediately*.  If the
> offending person is the employee's immediate supervisor, the report should be made
> to the next higher level of supervision.  *In the event that the employee feels unable
> to report the alleged incident to the immediate supervisor* or in the event the
> Superintendent feels unable to fairly and impartially investigate the alleged incident,

---

[28] *Id.*, Exhibit 10 (plaintiff's first deposition), at 32, 97.

[29] *Id.* at 98.  Compare this statement to Frazier's notes of plaintiff's response to question No. 9 *supra* page 8 ("Kirksey said, 'If I ever give him (Billy) some it's no telling what he would have done.'").

[30] *Id.*, Exhibit 10 (plaintiff's first deposition), at 101.

[31] *Id.* at 136.

[32] Compare this statement to Frazier's notes of plaintiff's responses to the two questions numbered "4" *supra* page 7, where plaintiff attributes a similar comment to Billy Adams.

[33] Defendant Pell City Board of Education's evidentiary submission (doc. no. 30), Exhibit 10 (plaintiff's first deposition), at 92.

[34] *Id.* at 95-96.  Plaintiff testified that this event occurred in November of 1998. *Id.*  However, her first EEOC charge, dated August 11, 1998, includes this incident among the other acts of objectionable conduct attributed to Kirksey. *Id.*, Exhibit 45, (EEOC charge dated August 11, 1998).  Moreover, as noted in text, plaintiff testified that she experienced no further harassment from any employee of the Board following Baker and Frazier's September 22, 1998 investigation.

[35] *Id.*, Exhibit 10 (plaintiff's first deposition), at 94.

the complaint will be received and investigated by the appropriate deputy superintendent or other person designated by the Superintendent.[36]

Plaintiff admitted that she was aware of the Board's sexual harassment policy throughout her employment.[37] She acknowledged that the Board provided drivers with an employee handbook containing a copy of the policy at the beginning of each school year.[38] More importantly, plaintiff confessed that she consulted and read the sexual harassment policy during the critical time frame: the 1997-98 and 1998-99 school years.[39]

The only explanation provided by plaintiff for her failures to report her complaints about Adams, Kirksey, or Drummonds in accordance with the Board's policy — that is, either to (a) "the next higher level of supervision" *and* "the Superintendent," or (b) to Della Baker *and* "the Superintendent" — is an odd one. She insists that, prior to September 16, 1998, when she finally lodged a complaint with Ms. Baker, she had complained to Dr. Billy Pack.[40] That assertion is curious in juxtaposition with two uncontested facts: (1) Dr. Pack was Superintendent of the Pell City School System from 1991 through the end of June, 1996;[41] and (2) plaintiff clearly testified that the offensive conduct about which she complains in this suit began in 1997,[42] after Dr. Pack's employment with the Board had ended. Further, plaintiff's testimony about her conversation with Dr. Pack is vague at best.

A.   Mr. Jack Pack, I talked to him about it.

Q.   Who?

---

[36] *Id.*, Exhibit 15 (emphasis supplied).

[37] *Id.*, Exhibit 10 (plaintiff's first deposition), at 63.

[38] *Id.*

[39] *Id.* at 63-65.

[40] *Id.* at 116-17.

[41] *Id.*, Exhibit 43 (Pack affidavit).

[42] *Id.*, Exhibit 10 (plaintiff's first complaint), at 16, 35-36, 93.

A.      Billy Jack Pack.

Q.      The superintendent?

A.      Yes.

Q.      When did you talk to him?

A.      Lord, I don't — it was right before Doctor Nicholson came.[43]

Q.      All right.  What did you tell him?

A.      We talked about that all they wanted over there was in my pants, and he said I didn't have to sleep with none of them for my job.  And he knowed about Mr. Drummonds making remarks about my breasts.

Q.      How do you know that, because you shared that with him?

A.      Yes, sir, and because Mr. Drummonds told me that he was talked to about — from Mr. Jack Pack.

        ...

Q.      Are you complaining that Billy Pack failed to take appropriate steps once you talked to him?

A.      No, I'm not complaining.  I think he done all that he knew to do at the time, you know, and he talked with Mr. Drummonds, and that satisfied me....[44]

Plaintiff elaborated her complaints about Kirksey's conduct in the EEOC charge she dated

and filed on August 11, 1998,[45] reading as follows:

My name is Paulette Perry and I am a bus driver for the Pell City School System.

---

[43] Dr. Pack's tenure as Superintendent of the Pell City School System ended June 30, *1996*. Dr. Phil Hammonds served as Superintendent during the 1996-97 school year.  Dr. Thomas Ingram held the position on an interim basis from the summer of 1997 until November 24, 1997, when Dr. Donna Nicholson was selected by the Board as Superintendent.  Thus, if plaintiff spoke to Dr. Pack "right before Dr. Nicholson came," the conversation would have occurred in November of 1997.

[44] Defendant Pell City Board of Education's evidentiary submission (doc. no. 30), Exhibit 10 (plaintiff's first deposition), at 116-119.
        Dr. Pack denied that plaintiff complained to him, either orally or in writing, of any sexual harassment by any employee of the Board, and added: "I never received a complaint of sexual harassment, either orally or in writing, from any employee against Foster Drummonds or Lewis Kirksey." *Id.*, Exhibit 43 (Pack affidavit), at 2.

[45] *Id.*, Exhibit 10 (plaintiff's first deposition), at 66-67.

I believe that I have been subjected to sexual harassment and or sex based discrimination because of my gender (female) in violation of Title VII of the Civil Rights Act of 1964, as amended.

I have been employed as a bus driver for the Pell City School System since approximately 1988.   For the past seven years or so I have experienced sexual harassment from Louis Kirksey who is a supervisor, as well as other individuals.[46]  On occasions, Mr. Kirksey has invited me to meet him at a motel.  I have always declined these unwanted and unsolicited offers.  I have also been subjected to sexual harassment from other individual [sic] who are under Mr. Kirksey's supervision.  These incidents included unwanted touching of my breasts and buttocks, as well as unwanted and unsolicited remarks from these individuals stating that they wanted to have sex with me.

As recently as May or June of 1998, Mr. Kirksey repeatedly talked about sex and oral sex in front of me.  He made statements such as, "If you let me have one chance with you, you would want another ,"[47] Mr Kirksey also described graphically the sexual acts he wished to perform on me, as well as he alleged to have performed on other females.

---

[46] The only harassment about which plaintiff complains in this suit began in 1997. With regard to the harassing behavior attributed to Lewis Kirksey "for the past seven years or so," plaintiff testified that after she complained to Foster Drummonds in 1990 or 1991, Kirksey's offensive behavior towards her stopped for several years. *Id.* at 92. Not until 1997 did Kirksey begin sexually harassing plaintiff again. *Id.* at 93.

[47] Note the similarity between this statement attributed to Kirksey and the one attributed to Billy Adams in Frazier's notes of plaintiff's responses to the two questions numbered "4" *supra* page 7 ("He said, 'if I would give him one night in bed I would not regret it.'").   More importantly, however, plaintiff testified during deposition that *Billy Adams, not* Lewis Kirksey, made this statement.

Q.    In the EEO complaint, you state that — make this statement that you heard, "If you let me have one chance with you, you would want another." Who said that to you?

A.    *Mr. Adams.  He wrote it in a letter and gave it to me on my bus.*

...

Q.    Did you ever take that letter to any supervisor?

A.    No, sir.

Q.    All right. *But it was Billy Adams that made that statement to you, and he did it in a letter?*

A.    *Yes, sir.*

Q.    *So, there's no question in your mind that it's Billy Adams that did that?*

A.    *He hand delivered it.  He gave it to me personally.*

Defendant Pell City Board of Education's evidentiary submission (doc. no. 30), Exhibit 10 (plaintiff's first deposition), at 100-101 (emphasis supplied).

14

On many other occasions, Mr. Kirksey would say, "When are you going to give me some girl?" Additionally, there was an incident where I had reported to Mr. Kirksey's office to determine the route which I was to take on a scheduled bus trip. At that time there was no one in Mr. Kirksey's office. When I turned to leave, Mr. Kirksey, who had apparently walked up behind me without my knowledge, grabbed me and kissed me. This incident was unwelcome and unsolicited by me.[48]

On numerous occasions I have complained to Mr. Kirksey's supervisor, Foster Drummonds. No steps have been taken to protect me from this behavior on the part of Mr. Kirksey and others.

This conduct has affected the terms and conditions of my employment in that I frequently get other drivers to turn in my time sheets in order to avoid contact with Mr. Kirksey and others. I have delayed prompt filing of mileage statements in order to avoid contact with these individuals. On occasion I have hidden in my bus to avoid being seen by Mr. Kirksey in fear that it would result in harassing conduct on his part. Furthermore, I arrive to work at the last possible minute to avoid prolonged contact with Mr. Kirksey and others. This conduct has been witnessed by John Hendricks, Brutus (last name unknown), and others who work in the bus shop with Mr. Kirksey.[49]

Plaintiff has not provided an explanation for the fact that her EEOC charge, filed more than one month prior to the date on which she complained to Della Baker about Billy Adams, included no statements about either Adams' conduct, or (as shall be seen in the next section) the even more objectionable actions she now attributes to Foster Drummonds.

In any event, Dr. Nicholson received a copy of plaintiff's EEOC charge on October 12, 1998.[50] After reading it, she

immediately went to Deloris Frazier, and I believe I let Mrs. Baker know. But, again, I went to Mrs. Frazier because she is our investigator and asked her to immediately, as quickly as she could get it done, start setting up whatever meetings she needed to set up, certainly with Mrs. Perry, with Mr. Kirksey and anyone else

---

[48] During deposition, plaintiff was questioned about this portion of her EEOC charge and testified that this incident occurred in November of 1998. Defendant Pell City Board of Education's evidentiary submission (doc. no. 30), Exhibit 10 (plaintiff's first deposition), at 101. That obviously is incorrect, however, for the reasons stated in note 34 *supra*.

[49] Complaint (doc. no. 1), Exhibit A (plaintiff's first EEOC charge).

[50] Defendant Pell City Board of Education's evidentiary submission (doc. no. 30), Exhibit 9 (Nicholson deposition), Exhibit 4 (October 16, 1998 letter from counsel for the Board to EEOC).

they needed to interview to find out what substance there was to the complaint.[51]
Ms. Baker and Ms. Frazier attempted to establish a date, time, and place for a meeting with plaintiff, to begin an investigation into the allegations contained in her EEOC charge.[52]

Upon advice of counsel, plaintiff refused to cooperate. *See* Defendant Pell City Board of Education's evidentiary submission (doc. no. 30), Exhibit 21 (October 5, 1998 letter from attorney, Richard A. Bearden, to Della Baker, stating: "It is my understanding from speaking with my client that you are requesting that she submit to an interview. I must respectfully decline to permit her to undergo any such interview while this matter is still pending before the EEOC.").

Baker and Frazier nevertheless proceeded to interview Lewis Kirksey, Foster Drummonds, John Hendrix, Lester Rich, Bonnie Howell, and Danny Howell on October 14, 1998.[53] Based on those interviews alone, however, Frazier and Baker were unable to substantiate plaintiff's allegations.[54]

### 3.    Foster Drummonds

Foster Drummonds routinely called plaintiff over the radio dispatch during 1997, requesting that she report to his office.[55] When plaintiff arrived, Drummonds would say things such as he had "dreamed" about her, or he would just sit and stare at her.[56] In 1998, Drummonds progressed from objectionable statements to conduct, touching plaintiff's breasts on ten to twenty occasions, and also kissing her.[57] On at least three occasions, Drummonds asked plaintiff to wear a dress and no panties,

---

[51] *Id.*, Exhibit 9 (Nicholson deposition), at 108-09.

[52] *Id.*, Exhibit 5 (Frazier deposition), at 54-55.

[53] *Id.*, Exhibit 51 (summary of October 14, 1998, interviews). Bonnie and Danny Howell are plaintiff's sister and brother-in-law, respectively.

[54] *Id.*, Exhibit 5 (Frazier deposition), at 97; *id.* Exhibit 2 (Baker deposition), at 76.

[55] *Id.*, Exhibit 10 (plaintiff's first deposition), at 37.

[56] *Id.*

[57] *Id.* at 38-39.

so that she could pull up her dress and show him her body.[58]  He also asked inappropriate questions about her preferred manner of performing sexual intercourse.[59]

In August of 1998, plaintiff accompanied Drummonds to the Kennedy School construction site, to discuss a job opportunity as head of housekeeping at the new facility.[60]  He asked plaintiff to take off her clothes and show him her body.[61]  Drummonds testified that he and plaintiff then engaged in sexual intercourse,[62] but plaintiff denies that.  She says that Drummonds grabbed her breasts, and she refused to comply with his request to take off her clothes.[63]

Drummonds testified that he told plaintiff, prior to meeting her at the Kennedy School construction site, that she could not be considered for the position, because "[t]he school board has a policy [providing that] noncertificated  persons cannot hold down two jobs."[64]  That policy, adopted December 5, 1994, states: "Certificated and/or noncertificated  employees shall not be employed concurrently in more than one (1) full-time employment position."[65]  Plaintiff argues in the brief submitted in opposition to summary judgment that she "could" (not that she "would") have given up her bus route for the housekeeping position.[66]

Plaintiff has provided two explanations for not complaining about Drummonds' conduct until this suit was filed.  First, as previously discussed, she insists that she reported Drummonds'

---

[58] *Id.* at 136.

[59] *Id.* at 130.

[60] *Id.* at 135-36.

[61] *Id.* at 136.

[62] *Id.*, Exhibit 4 (Drummonds deposition), at 97-106.

[63] Plaintiff's evidentiary submission (doc. no. 34), Exhibit 1 (Perry affidavit), at ¶ 27.

[64] Defendant Pell City Board of Education's evidentiary submission (doc. no. 30), Exhibit 4 (Drummonds deposition), at 102.

[65] *Id.*, Exhibit 32 (Employment policy).

[66] Plaintiff's Responsive Submission in Opposition to Defendants' Motion for Summary Judgment (doc. no. 35), at 24 ("Plaintiff could certainly have given up her bus route for the new position; thus, not running afoul of the apparent School System policy.").

harassment (as well as that of Lewis Kirksey and Billy Adams) to Dr. Billy Pack.[67]

Second, she also asserts that on September 16, 1998, "right after this incident with Billy [Adams]," she complained to Della Baker that Drummonds had touched her breasts,[68] and that she "did bring up Foster [Drummonds] and Lewis Kirksey, too," during her September 22, 1998 interview by Baker and Deloris Frazier.[69]   The record, however, establishes that plaintiff first complained to Della Baker on September 16, 1998, and then only about *Billy Adams* showing her "unwanted attention."[70] Further, Frazier's notes of plaintiff's interview do not reflect any statements attributing overt harassment to Drummonds.  Finally, plaintiff's deposition testimony regarding her September 22 interview by Baker and Frazier confirms that she told them only that Drummonds had failed to take appropriate action to stop Billy Adams' harassing conduct.[71]

Q.    So, who did you tell them in that meeting was harassing you?

A.    Billy Adams, Foster Drummonds and Lewis Kirksey.

Q.    *Did you share with them the nature of the harassment; that is, what they were — each of those three people were doing?*

A.    Billy Adams, *but I didn't go into Mr. Kirksey or Mr. Drummonds.*

...

Q.    In that conversation did you complain at all in any form or manner about Foster Drummonds to Deloris or Della?

A.    Yes, sir, I think to my knowledge I did bring up Foster and Lewis Kirksey, too, as being part of it.

---

[67] *See supra* notes 40-44 and accompanying text.

[68] Defendant Pell City Board of Education's evidentiary submission (doc. no. 30), Exhibit 10 (plaintiff's first deposition), at 44-45.

[69] *Id.* at 29-30, 33.

[70] *See supra* note 18.

[71] Defendant Pell City Board of Education's evidentiary submission (doc. no. 30), Exhibit 10 (plaintiff's first deposition), at 29-30, 33.

Q.   *What did you share with them about Foster; that is, what did you tell them that Foster was doing that you thought was violative of your rights?*

A.   *That I had went to him on several occasions about Billy's actions, and he would do nothing about it.*[72]

Plaintiff most assuredly did not mention that Drummonds had kissed her, or that he had fondled her breasts ten to twenty times, nor did she describe whatever had occurred at the Kennedy School construction site. She has provided no explanation for those omissions.

Plaintiff also has failed to provide explanations for these uncontested facts: neither the EEOC charge she filed on August 11, 1998, nor the written statement she submitted to Della Baker one month later, on September 18, 1998, describe Foster Drummonds' objectionable conduct.

In any event, plaintiff admits that Drummonds' harassment, like that of Adams and Kirksey, ceased following Baker and Frazier's September 22, 1998 investigation into the charges she had made about Billy Adams.[73]

The Board contends that it only learned of Drummonds' conduct when plaintiff's attorney submitted her affidavit to the Board's attorney on March 15, 1999.[74] That affidavit, dated February 12, 1999, reads as follows:

1.   My name is Paulette Perry and I am over the age of 19 years.

2.   I am currently employed as a bus driver with the Pell City School System. I have been so employed since approximately 1988.

3.   From 1988 to the present, Louis Kirksey (male) has had supervisory authority over me. From approximately 1990 to the present, Foster Drummonds, (male) has had supervisory authority over me.

4.   During much of my employment as a bus driver with the Pell City School System, I have been subjected to unwanted sexual comments, touchings, and

---

[72] *Id.* at 29-30, 33 (emphasis supplied).

[73] *Id.* at 34-35.

[74] *Id.*, Exhibit 29 (March 15, 1999 letter from Richard A. Bearden to Donald Sweeney).

advances by various employees and supervisors of the Pell City School System.

5.      In the early 90's, a male whom I knew as J. B. and whose last name I believe to be Hare would repeatedly grab my breasts. In response I lodged complaints to Foster Drummonds; however, no action was ever taken against JB.

6.      J. B. engaged in this type of conduct with other bus drivers as well. I recall specifically that he did this to Rhonda Haynes and others.

7.      This conduct on the part of J. B. was witnessed by Lester Rich, Mr. Henderson (deceased) and, perhaps, Louis Kirksey.

8.      Also in the early 90s, Will Barber, who was also an employee of the Pell City School System, would, on occasion, touch my buttocks and my breast. Additionally, he would make remarks to me about wanting to have sex with me.

9.      Mr. Barber also engaged in similar conduct with other bus drivers such as Donna Ledlow and others.

10.      This conduct on the part of Will Barber was unwanted and uninvited. Again I complained to Foster Drummonds; however, no action was taken against Will Barber for this conduct. Mr. Drummonds did inform me that others had made similar complaints against Mr. Barber.

11.      Will Barber's conduct was witnessed by Foster Drummonds and Louis Kirksey and likely by the other bus drivers.

12.      Beginning in the 1997/1998 school year, and continuing into the present school year, a mechanic for the Pell City School System, Billy Adams, made repeated romantic advances to me.

13.      Billy would leave love notes and presents on the driver seat of my bus on a frequent basis.

14.      On one occasion Billy informed me that he had told his wife he was in love with me.

15.      Louis Kirksey encouraged Billy's behavior toward me in numerous ways. On one occasion in the latter part of the 1997 - 1998 school year, Mr. Kirksey told Billy in my presence that he (Kirksey) would arrange for Billy and me to take the busses to be serviced. Kirksey then suggested that while we were waiting for the busses to be serviced, we could go to a nearby motel. On other occasions, Mr. Kirksey would make statements to me such as "why don't you give that boy (referring to Billy) a little bit?" and other remarks to that effect.

16.     Billy's conduct was so pervasive that it was noticed by most everyone in the bus shop. Additionally, remarks were made by the students riding on my bus indicating they were aware of Billy's conduct toward me.

17.     In conversations with me, my supervisor, Foster Drummonds, would refer to Billy as "your boyfriend" and make statements such as "if you stop, he stumbles over you."

18.     I made repeated pleas to both Louis Kirksey and Foster Drummonds to make Billy stop his conduct toward me; however, nothing was done.

19.     At the beginning of the present school year, Della Baker became my immediate supervisor. Foster Drummonds was transferred or promoted to another position within the Pell City School System.

20.     At the beginning of the current school year, Billy's conduct toward me continued.

21.     Again I complained to my supervisor, (Della Baker) and finally steps were taken to protect me.

22.     Louis Kirksey, in addition to encouraging Billy's conduct, has engaged in the conduct which is alleged in my EEOC charge and which is attached to this affidavit.

23.     Witnesses to Mr. Kirksey's behavior toward me would include Della Baker, Robin Stuart, Ellen Layton, Grace Sandiego, Betty Welch, Carvas Welch, Buster Coates, Pat Carter, Brutus McCluncy. There are likely others who have knowledge concerning these matters.

24.     Additionally, Louis Kirksey told me on numerous occasions, most recently at the end of the '97 -'98 school year, that "Mr. Drummonds's [sic] wants to get in your pants."

25.     On several occasions Mr. Drummonds would call me at home after working hours and leave messages asking me to give him a call and stating "I'm alone at the shop." On other occasions he would call me and ask me to meet with him and tell me to leave my daughter at home when I came to meet him. Again, these events were most frequent at the end of the '97 - '98 school year.

26.     On or about August, 1998, before the beginning of the '98 - '99 school year, Foster Drummonds asked me to meet him at Kennedy Elementary School which was, at that time, finishing completion of construction. He indicated that he wanted to speak with me about a job opportunity.

21

27.     I met Mr. Drummonds on that occasion to speak with him about a new employment position within the school system. However, rather than discussing an employment position, Mr. Drummonds grabbed my breasts and asked me to go into the restroom and remove my clothes so that he could see my breasts.

28.     I refused to comply with Mr. Drummonds's request.

29.     During the period of time that Foster Drummonds was my supervisor, especially during the period of time of the '97 - '98 school year, Foster Drummonds would summon me to his office for no apparent reason. He would call me at home as well as contact me over the bus radio.

30.     These incidents occurred on an almost daily basis. Additionally, many of the bus drivers were witness [sic] to this conduct since Mr. Drummonds would often summon me to his office over the radio and each bus was equipped with a radio.

31.     On more than one occasion, Foster Drummonds would make comments about my clothing. On one occasion he asked me about my bra. On another occasion, he requested that I wear dresses to work.

32.     The above is, by no means, an exhaustive account of the conduct to which I have been subjected. Especially during the '97 - '98 school year I was subjected to this type of behavior by Kirksey or Drummonds or others on an almost daily basis.[75]

The Board promptly conducted an investigation into the foregoing allegations.[76] On the date this affidavit was received by the Board, however, Drummonds was not at work: he had been on medical leave since January 19, 1999, following back surgery.[77] He never returned to work.[78]

## C.     Plaintiff's Retaliation Claims

### 1.     Plaintiff disciplined more harshly than other drivers

On October 1, 1998, plaintiff was delayed in Birmingham, and called the school system office at approximately 12:15 that afternoon to say that she "wasn't for sure if [she] could make it

---

[75] *Id.*, Exhibit 31 (Perry affidavit).

[76] *Id.*, Exhibit 5 (Frazier deposition), at 106-07.

[77] *Id.*, Exhibit 4 (Drummonds deposition), at 121, 159.

[78] *Id.*

back in time to get on [her] bus," and "that if [she] wasn't back, to get someone else to fill in for [her]."[79]  When she determined that she would not get back in time to run her bus route, plaintiff simply drove home.[80]  The following day, she was written up by her supervisor, Della Baker, for missing her afternoon bus route.[81]  Although plaintiff admits that "it was a short notice to call in,"[82] she contends that other drivers have shown up late for their routes, or not shown up at all, but have not been written up for such absences.[83]

### 2.   Mechanics directed to stay away from plaintiff

On November 10, 1998, Della Baker directed bus mechanics M.C. English, Lester Rich, and John Hendrix to avoid contact with plaintiff,[84] saying "they should not be alone with [plaintiff] to protect themselves"; that "if anything came up ... there should be more than one of them."[85]  Plaintiff complains that the mechanics have avoided her since that date, unless Baker is not around.[86]  She admits, however, that she does not need to interact with mechanics in order perform the duties of her job.[87]

### 3.   Dr. Nicholson's bus ride

During November of the 1998-99 school year, plaintiff "wrote-up" four students for misbehaving on her bus.[88]  Following the second such "write-up," Della Baker suspended two of the

---

[79] *Id.*, Exhibit 11 (plaintiff's second deposition), at 59.

[80] *Id.*

[81] *Id.*, Exhibit 11 (plaintiff's second deposition), Exhibit 15 (October 1, 1998 memorandum from Della Baker to Paulette Perry).

[82] *Id.*, Exhibit 11 (plaintiff's second deposition), at 59.

[83] *Id.* at 59-60.

[84] *Id.*, Exhibit 2 (Baker deposition), Exhibit 16 (November 18, 1998 memorandum to the record).

[85] *Id.*, Exhibit 2 (Baker deposition), at 147-48; *id.*, Exhibit 44 (Plaintiff's EEOC charge filed February 29, 2000).

[86] *Id.* at 197-98.

[87] *Id.* at 198-99.

[88] *Id.*, Exhibit 11 (plaintiff's second deposition), at 82-87.

four students.[89]  The father of both suspended students complained to Baker that his children were being treated unfairly.[90]  He later called Dr. Nicholson to make a similar complaint.[91]  Dr. Nicholson arranged a meeting in her office with the father, Baker, and plaintiff.[92]  They jointly agreed that plaintiff should move the two students to the front of her bus, to watch them more closely.[93]  After the father left, Dr. Nicholson told plaintiff that if she could not do her job, someone else would.[94]

Dr. Nicholson testified that she asked plaintiff, "would it be of any help to you ... if I came on the bus and talked to your children and tried to let them know that you are supported by my office?"[95] and that plaintiff agreed that would be helpful.[96]  Plaintiff denies that Dr. Nicholson made such an offer.[97]

In any event, a day or so after the meeting, Dr. Nicholson boarded plaintiff's bus at the Coosa Valley Elementary School stop.[98]  Nicholson " verbally chastis[ed] some of the children .... physically pushed two of the children ... into their seats[,] and physically pulled a third child from his seat and off the bus" when he interrupted her speech.[99]  Nicholson told the students that they were "the rudest bunch of kids she had ever seen in her entire life."[100]

After two parents called plaintiff inquiring about Dr. Nicholson's behavior, she reported the

---

[89] *Id.* at 86-87.

[90] *Id.* at 86, 89.

[91] *Id.* at 90; *id.*, Exhibit 9 (Nicholson deposition), at 83-86.

[92] *Id.*, Exhibit 11 (plaintiff's second deposition), at 90; *id.*, Exhibit 9 (Nicholson deposition), at 84.

[93] *Id.*, Exhibit 11 (plaintiff's second deposition), at 91-92.

[94] *Id.* at 94-95.

[95] *Id.*, Exhibit 9 (Nicholson deposition), at 87.

[96] *Id.* at 89.

[97] *Id.*, Exhibit 11 (plaintiff's second deposition), at 96-97.

[98] *Id.* at 99; *id.*, Exhibit 47 (plaintiff's EEOC charge filed February 29, 2000), at 1.

[99] *Id.*, Exhibit 47 (plaintiff's EEOC charge filed February 29, 2000), at 1; *id.*, Exhibit 11 (plaintiff's second deposition), at 99-101.

[100] *Id.*, Exhibit 11 (plaintiff's second deposition), at 101.

incident to Della Baker.[101]  As a result, Dr. Nicholson and Della Baker met with plaintiff and one

of the inquiring parents.[102]  During the course of the meeting, the parent asked plaintiff what she had

observed.[103]  When plaintiff described how Dr. Nicholson addressed the children, Dr. Nicholson

immediately ended the meeting.[104]  After the parent left the room, Dr. Nicholson pointed her finger

at plaintiff, called her a "liar," and ordered her out of the office.[105]  "When [plaintiff] exited the

office [Dr.] Nicholson slammed the door behind [her]."[106]

   The following week, plaintiff's bus was equipped with a video camera.[107]  Plaintiff alleges

that the camera is "Dr. Nicholson's way of showing me she was going to keep an eye on me ...."[108]

Several other buses also were equipped with video cameras.[109]  Della Baker testified the cameras

were installed for the purpose of :

> protect[ing] the driver in instances of misconduct or problems on the bus.  The
> majority of the time that we have used it, we've been able to prove to the parent that
> the student was actually doing what they said they were doing.[110]

Plaintiff admitted her recognition of the safety and disciplinary benefits of placing a video camera

on a bus.[111]

### 4.    "Checking" on plaintiff

Following the foregoing incidents, Dr. Nicholson also asked Mack Mayo, principal of Duran

---

[101] *Id.* at 102; *id.*, Exhibit 47 (plaintiff's EEOC charge filed February 29, 2000), at 1.

[102] *Id.*, Exhibit 11 (plaintiff's second deposition), at 112.

[103] *Id.* at 113; *id.*, Exhibit 47 (plaintiff's EEOC charge filed February 29, 2000), at 2.

[104] *Id.*, Exhibit 11 (plaintiff's second deposition), at 113.

[105] *Id.*; *id*, Exhibit 47 (plaintiff's EEOC charge filed February 29, 2000), at 2.

[106] *Id.*, Exhibit 47 (plaintiff's EEOC charge filed February 29, 2000), at 2.

[107] *Id.*, Exhibit 11 (plaintiff's second deposition), at 185

[108] *Id.* at 184.

[109] *Id.*, Exhibit 2 (Baker deposition), at 33-38.

[110] *Id.* at 35.

[111] *Id.*, Exhibit 11 (plaintiff's second deposition), at 187.

Junior High School, and Thelma Jones, principal of Coosa Valley Elementary School, "to check to see how everything was going" on plaintiff's bus, because she "was supposed to have the meanest kids on the school grounds."[112]  Thereafter, Principal Jones frequently boarded plaintiff's bus when it stopped at his school.[113]  Plaintiff also claims that the students who rode her bus told her that they were called in for "a talking to" at the high school.[114]

### 5.    Failure to post plaintiff's name for flower donations

Plaintiff was hospitalized for surgery on some undisclosed date during the 1998-99 school year.[115]  Della Baker failed to promptly post a memo in the bus shop, requesting that employees contribute money to purchase flowers for her.[116]  Baker did not post such a memo until another employee, Lester Rich, also became ill; and then she requested donations for both.[117]  Flowers were purchased for plaintiff before she returned to work, but they were not delivered to her home.[118]

### 6.    Handling of complaints against Calhoun and Kirksey

During October of the following 1999-2000 school year, plaintiff complained to Della Baker that Robin Calhoun (another bus driver) and Lewis Kirksey were not making her feel "included" when they drove members of the high school marching band to football games.[119]  Baker promised to meet with all bus drivers, to "ask everybody to try to get along with everybody, and if not, carry it outside the gate."[120]  At that meeting, Baker announced that "she was tired of this nit-picking stuff,

---

[112] *Id.* at 182.
[113] *Id.*
[114] *Id.*
[115] *Id.* at 45-46
[116] *Id.*
[117] *Id.* at 45-47.
[118] *Id.* at 46-47.
[119] *Id.* at 125-26.
[120] *Id.* at 130.

that if we couldn't get along with anybody, it was to be carried outside the gate."[121]   Plaintiff was grateful for Baker's response,[122] but asserts that Baker also should have talked specifically to Kirksey and Calhoun, "and told them look, get along with [plaintiff], you know, while ya'll are on the job."[123]

### 7.   Suspension with pay

On October 18, 1999, shortly after Baker's meeting with all bus drivers, plaintiff engaged in a heated confrontation with Robin Calhoun.[124]   Calhoun walked in front of plaintiff's bus as she was driving out of the parking lot.[125]   Plaintiff blew her horn, stopped the bus, and asked Calhoun whether she "had a problem,"[126] and added, "if she had a problem[,] we would settle it."[127]   Calhoun responded they should not "settle it" on school property, but somewhere else.[128]   Plaintiff persisted, insisting they "settle it there [because] it all starts there."[129]   As plaintiff "started to shut [her] door ... [Calhoun] stopped it with her arm."[130]   When Calhoun turned to walk away, plaintiff called her a "black fucker."[131]

Shortly after this incident, plaintiff went to Della Baker's office, but did not mention the confrontation with Calhoun.[132]   About ten minutes later, however, Calhoun telephoned Baker to

---

[121] *Id.* at 131.

[122] *Id.* at 131-32.

[123] *Id.* at 132.

[124] *Id.* at 124-25.

[125] *Id.* at 133.

[126] *Id.* Plaintiff testified that Calhoun called her a "bitch" before she blew her horn. *Id.* at 134. Plaintiff's handwritten statement made two days after the incident, however, fails to mention any such comment by Calhoun. *Id.*, Exhibit 37 (plaintiff's written statement of October 20, 1999).

[127] *Id.*, Exhibit 37 (plaintiff's written statement of October 20, 1999), at 1.

[128] *Id.*

[129] *Id.*

[130] *Id.* at 2.

[131] *Id.*

[132] *Id.*, Exhibit 11 (plaintiff's second deposition), at 146.

report the incident.[133]   Baker asked a mechanic to remove the video tape from the camera on plaintiff's bus, and called Dr. Nicholson.[134]   At Dr. Nicholson's request, Baker took the video tape to Nicholson's office and they viewed it together.[135]

The next day, Della Baker called plaintiff and Robin Calhoun into her office to discuss the incident.[136]  Following the meeting, plaintiff received a memo from Baker, describing her conduct during the meeting as "totally inappropriate."[137]  Plaintiff subsequently submitted a written statement to Baker, explaining her version of the confrontation with Calhoun.[138]   When plaintiff arrived at Duran Junior High School on October 20, 1999, the vice principal told her that she was "needed in the office."[139]  When she reached the office, Jim Childree gave plaintiff a letter suspending her.[140]  Although the letter stated plaintiff was suspended for October 22 and October 22,  Mr. Childree explained that the suspension began immediately and escorted plaintiff to her car.[141]  "The School Board had even arranged for a police officer to be present on that occasion."[142]

Dr. Nicholson then met with plaintiff and extended her suspension pending an investigation.[143]   Dr. Nicholson asked plaintiff whether she wanted any particular drivers

---

[133] *Id.*, Exhibit 2 (Baker deposition), at 99-100.

[134] *Id.* at 103-105.

[135] *Id.* at 105-106.

[136] *Id.*, Exhibit 11 (plaintiff's second deposition), at 148; *id.*, Exhibit 47 (plaintiff's EEOC charge filed February 29, 2000), at 2.

[137] *Id.*, Exhibit 36 (October 10, 1999 memo from Della Baker to plaintiff).

[138] *Id.*, Exhibit 11 (plaintiff's second deposition), at 150; *id.*, Exhibit 37 (plaintiff's written statement of October 20, 1999).

[139] *Id.*, Exhibit 11 (plaintiff's second deposition), at 152-53; *id.*, Exhibit 47 (plaintiff's EEOC charge filed February 29, 2000), at 2.

[140] *Id.*, Exhibit 11 (plaintiff's second deposition), at 154; *id.*, Exhibit 47 (plaintiff's EEOC charge filed February 29, 2000), at 2.

[141] *Id.*, Exhibit 11 (plaintiff's second deposition), at 154-56; *id.* Exhibit 47 (plaintiff's EEOC charge filed February 29, 2000), at 2.

[142] *Id.*, Exhibit 47 (plaintiff's EEOC charge filed February 29, 2000), at 2.

[143] *Id.*, Exhibit 11 (plaintiff's second deposition), at 157.

interviewed as part of the investigation.[144]  Plaintiff did not suggest anyone.[145]  She was suspended

for five days, but received full pay the entire time.[146]  Calhoun was not suspended, because Dr.

Nicholson determined that she did not instigate the quarrel.[147]  Plaintiff asserts that Calhoun should

have received the same punishment.[148]  Further, plaintiff asserts that other drivers have engaged in

similar conflicts, but none were suspended.[149]

### 8.    Denial of field trips

Plaintiff has been asked to drive on school field trips less frequently since filing her EEOC

charge.[150]  She testified that she had been allowed to drive only "two or three" trips, but admitted

that she turned down driving opportunities "a couple of times."[151]  "[A]ll of the sudden I just fall slap

out of the picture to where I am not even asked unless it is a have to."[152]  Plaintiff has continued to

drive the band to out-of-town football games for extra pay.[153]

## III. DISCUSSION

### A.    Some General Principles of Sexual Harassment Law

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an

employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against

any individual with respect to his compensation, terms, conditions, or privileges of employment,

---

[144] *Id.* at 157-58.

[145] *Id.*

[146] *Id.* at 158-59.

[147] *Id.* at 160-61; *id.*, Exhibit 2 (Baker deposition), at 108.

[148] *Id.*, Exhibit 11 (plaintiff's second deposition), at 165.

[149] *Id.*, Exhibit 47 (plaintiff's EEOC charge filed February 29, 2000).

[150] *Id.*, Exhibit 11 (plaintiff's second deposition), at 43.

[151] *Id.* at 43, 194-95.

[152] *Id.* at 195.

[153] *Id.* at 124.  In contrast, the Board's records establish that, during the 1999-2000 school year, plaintiff drove on sixteen field trips, declined an offer to drive on three trips, and either did not respond or declined to drive the vocational bus route on thirteen occasions.  *Id.* Exhibit 44 (Thomason affidavit), Att. A.  As of November 16, 2000, plaintiff had driven a bus on four field trips, and declined to drive on another five.  *Id.*

because of such individual's ... sex ...." 42 U.S.C. § 2000e-2(a)(1). That statutory language does not mention, let alone define, "sexual harassment."[154] Even so, the Supreme Court held in *Meritor Savings Bank, FSB v. Vinson* that "unwelcome sexual advances that create an offensive or hostile working environment violate Title VII. Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). The *Meritor* Court went on to say that Title VII is violated, and sexual harassment is actionable, whenever the workplace is permeated with "discriminatory intimidation, ridicule, and insult," *id.* at 65, 106 S.Ct. at 2405, that is "sufficiently severe or pervasive 'to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 67, 106 S.Ct. at 2405 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)).

"Sexual harassment in the workplace is a serious matter." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1252 n.10 (11th Cir. 1999) (en banc). As a consequence, federal law focuses upon a victimized employee's employer, rather than the persons who actually committed the harassment complained of, as the most effective means of eradicating discrimination in the workplace.[155] The reason for that is simple:

---

[154] "The prohibition against discrimination based on sex was added to Title VII at the last minute on the floor of the House of Representatives." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 63, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (citing 110 Cong.Rec. 2577-2584 (1964)). As a consequence, "we are left with little legislative history to guide us in interpreting the Act's prohibition based on 'sex.'" *Id.* at 64, 106 S.Ct. at 2404.

[155] See *Busby v. City of Orlando*, 931 F.2d 764 (11th Cir. 1991), where the Eleventh Circuit held:

> Individual capacity suits under Title VII are ... inappropriate. The relief granted under Title VII is against the *employer*, not individual employees whose actions would constitute a violation of the Act. We think the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly.

*Id.* at 772 (citations omitted) (emphasis in original). *Accord, e.g., Cross v. State of Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Smith v. Lomax*, 45 F.3d 402, 403 n.4 (11th Cir. 1995).

> the power and influence of an employer over the atmosphere in a workplace cannot
> be overstated. The whole point of recognizing hostile work environment sexual
> harassment as a form of workplace discrimination under Title VII is that employees
> are entitled to a work environment that allows them to function effectively and to do
> the work they were hired to perform to the best of their ability without having to run
> a gauntlet of sexual abuse or face other forms of discrimination. ... When an
> employee's ability to perform his or her job is compromised by discriminatory acts
> including sexual harassment and the employer knows it, it is the employer that has
> the ability, and therefore the responsibility, to address the problem, whether the
> harasser is a supervisor, a co-worker, a client, or a subordinate. ...

*Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1366 (11th Cir. 1999) (citations and internal quotation marks omitted).

To establish a prima facie case of sexual harassment, a plaintiff must demonstrate that: (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment complained of was based upon the plaintiff's sex; (4) the harassment complained of either culminated in an adverse, "tangible employment action," or was sufficiently severe or pervasive as to alter the terms and conditions of the plaintiff's employment, and create a discriminatorily intimidating, hostile, or abusive working environment; and (5) a basis for holding the employer liable. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Mendoza*, 195 F.3d at 1245; *Gupta v. Florida Board of Regents*, 212 F.3d 571, 582 (11th Cir. 2000); *Cross v. State of Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497, 1502-03 (11th Cir. 1985); *Henson*, 682 F.2d at 903-05.

The first element is satisfied by "a simple stipulation that the employee is a man or a woman." *Henson*, 682 F.2d at 902.

The second element has two components which may require independent analysis in a

particular case. First, the statements and conduct complained of must have been "unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Id.* at 903; *see also Meritor*, 477 U.S. at 68, 106 S.Ct. at 2406 ("The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'") (citing 29 C.F.R. § 1604.11(a)). Second, the statements and conduct complained of must have been

> of a sexual or gender-related nature — "sexual advances, requests for sexual favors, [or] conduct of a sexual nature" ... — before they are considered in determining whether the severe or pervasive requirement [the fourth element of a prima facie case] is met. Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted. Title VII, as it has been aptly observed, is not a "general civility code." ...

*Gupta*, 212 F.3d at 583 (citations omitted). Based upon the conduct described by plaintiff, both components of the second element are satisfied.

The third element does not require extended discussion. The harassment of which plaintiff complains clearly was based upon her sex.

The remaining elements — and particularly the last — require closer scrutiny.

The fourth element of a prima facie case requires the plaintiff to prove that the harassment complained of either culminated in an adverse, "tangible employment action," or that it was sufficiently severe or pervasive as to alter the terms and conditions of the plaintiff's employment, and create a discriminatorily intimidating, hostile, or abusive working environment

> Sexual harassment constitutes sex discrimination only when the harassment alters the terms or conditions of employment. The paradigm of sexual harassment as federally prohibited employment discrimination occurs when an employee's expressed terms of employment, such as salary or continued employment, are conditioned upon compliance with the employer's sexual demands. *Burlington Indus.*, 118 S.Ct. at 2265 ("When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and

conditions of employment that is actionable under Title VII."). In such a case, traditionally described as quid pro quo harassment, the "discrimination with respect to terms or conditions of employment [is] explicit." *Id.* at 2264; *see also Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1246 (11th Cir. 1998).

Absent such "explicit" discrimination, an employee must make some showing in order to connect allegations of sexual harassment to a violation of Title VII. Thus, in the cases traditionally described as hostile-environment cases, an employer's harassing actions toward an employee do not constitute employment discrimination under Title VII unless the conduct is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor*, 477 U.S. at 67, 106 S.Ct. [at] 2399 (quoting *Henson*, 682 F.2d at 904).

*Mendoza*, 195 F.3d at 1245-46.

An adverse, "tangible employment action" is one which "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," or "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Ellerth*, 524 U.S. at 761, 118 S.Ct. at 2268-69 (citation and internal quotation marks omitted); *see also Gupta*, 212 F.3d at 587 ("An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.").

In contrast, neither a "bruised ego," nor a "demotion without change in pay, benefits, duties, or prestige," or "reassignment to [a] more inconvenient job," are sufficiently "tangible" to be deemed *adverse* employment actions. *Id.* (citations omitted).

The standard for determining whether a particular employment action is "adverse" in some "tangible" sense is objective, not subjective: that is, the "plaintiff must demonstrate that a

33

reasonable person in [her] position would view the employment action in question as adverse." *Doe v. Dekalb County School District*, 145 F.3d 1441, 1449 (11th Cir. 1999). Thus, a contested employment decision is not "adverse" simply because a plaintiff subjectively perceives it as an "unkind act,"[156] or the plaintiff "'dislikes it or disagrees with it,'"[157] or it makes her "unhappy."[158] Rather, "a plaintiff must establish not only that she subjectively perceived the environment as hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive." *Gupta*, 212 F.3d at 583. "Otherwise, every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996).

In short, the adversity must be *material*, and *tangible*: "it is not enough that a transfer [or other employment action] imposes some *de minimis* inconvenience or alteration of responsibilities." *Doe*, 145 F.3d at 1453 (citation omitted).

"A recurring point" in the Supreme Court's opinions "is that 'simple teasing,' ... offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2283 (quoting *Oncale*, 523 U.S. at 82, 118 S.Ct. at 1003); *see also DeAngelis v. El Paso Municipal Police Officers Association*, 51 F.3d 591, 593 (5th Cir. 1995) ("A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy [a woman's] equal opportunity in the workplace.").

---

[156] *Wu v. Thomas*, 996 F.2d 271, 273 n.3 (11th Cir. 1993) (per curiam).

[157] *Doe v. Dekalb County School District*, 145 F.3d 1441, 1449 (11th Cir. 1999) (quoting *Perryman v. West*, 949 F. Supp. 815, 819 (M.D. Ala. 1996)).

[158] *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996); *accord Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997).

Furthermore, "incidents of environmental sexual harassment must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher*, 524 U.S. at 787 n.1, 118 S.Ct. at 2283 n.1 (citation and internal quotation marks omitted); *see also Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.").

Thus, it is the fourth element of a prima facie case that "tests the mettle of most sexual harassment claims." *Gupta*, 212 F.3d at 583.

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code. ... Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing. ... We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment....

*Faragher*, 524 U.S. at 788, 118 S.Ct. at 2283-84 (citations and internal quotation marks omitted).

The standards for determining an employer's liability for sexual harassment are addressed in the fifth element of a prima facie case and, generally speaking, the standards initially turn upon the answers to as many as four questions. First, what was the harasser's status in the employer's workplace *vis-a-vis* the plaintiff-victim: was he a high-ranking official in the upper echelons of the employer's organization,[159] a supervisor,[160] or merely a co-worker? Second, if the harasser was a

---

[159] If the harasser was in the upper echelons of management — one who was "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy" — then the employer is strictly liable, regardless of the form the harassment took (*quid pro quo* or hostile environment), and regardless of whether it resulted in an adverse, "tangible employment action." *Faragher*, 524 U.S. at 789, 118 S.Ct. at 2284 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 19, 114 S.Ct. 367, 369, 126 L.Ed.2d 295 (harasser was president of the corporate employer); *Burns v. McGregor Electronic Industries, Inc.*, 955 F.2d 559, 564 (8th Cir. 1992) (harasser was owner of employer-company); *Torres v. Pisano*, 116 F.3d 625, 634-35 & n.11 (2d Cir. 1997) (observing that a supervisor may hold a sufficiently high position "in the management hierarchy of the company for his actions to be imputed automatically to the employer"); *Katz v. Dole*, 709 F.2d 251, 255 (4th Cir. 1983) ("Except in situations where a

supervisor, did an adverse, "tangible employment action" occur?  Third, if the harasser was a

supervisor, but the harassment did not culminate in an adverse, "tangible employment action," what

was the employer's response to the harassment?  Finally, if the harasser was merely plaintiff's co-

worker, did the employer know of the harassment (either actually or constructively) and take prompt

and appropriate remedial action?

 If the harassment was committed by a supervisor with immediate (or successively higher)

authority over the plaintiff, the standards for determining the employer's liability turn upon the issue

of whether the harassment culminated in an adverse, "tangible employment action."

> [W]hen analyzing whether an employer should be held liable for a supervisor's
> harassment, courts should separate these cases into two groups:  (1) harassment
> which culminates in a "tangible employment action," such as discharge, demotion
> or undesirable reassignment, and (2) harassment in which no adverse "tangible
> employment action" is taken but which is sufficient to constructively alter an
> employee's working conditions. ...  Under this analysis, when a supervisor engages

---

proprietor, partner or corporate officer participates personally in the harassing behavior," the plaintiff must demonstrate "the propriety of holding the employer liable")); *see also Ellerth*, 524 U.S. at 758, 118 S.Ct. at 2267 (referring to those agents of the employer whose "high rank in the company makes him or her the employer's alter ego").

> This doctrine encompasses two categories of officials. The first are individuals who are the officers of the corporate or other entity, such as directors, owners, partners, or corporate officers.

> The second group are those other individuals of such "high rank" or "high position" that their actions may fairly be deemed the actions of the employer. *Faragher* and *Ellerth* identify this as a group for whose actions the corporate or other entity will be legally accountable, but provide no further guidance regarding such individuals.

Philip J. Pfeiffer (ed.), *Lindemann & Grossman's Employment Discrimination Law Third Edition* 515 (Supp. 2000).

[160] The delineation of those persons who may be classified as "supervisors" can prove difficult.  Some courts have defined the term as including those persons who exercise control over a plaintiff's daily activities or duties, even if the person did not have the power to make hiring, firing, or promotion decisions. *See, e.g., Grozdanich v. Leisure Hills Health Center, Inc.*, 25 F. Supp. 2d 953, 971 ( D. Minn. 1998) (term "supervisor" includes persons with control over daily activities and who have power to recommend disciplinary action).

Other courts limit the term "supervisor" to those person possessing the power to hire, fire, demote, promote, transfer, or discipline an employee. *See, e.g., Parkins v. Civil Constructors of Illinois*, 163 F. 1027 (7th Cir. 1998). "Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes [of] imputing liability to the employer." *Id.* at 1033.

The EEOC struck a middle course between these two positions, and stated that a person qualifies as an employee's "supervisor" if: "a. the individual has authority to undertake or recommend tangible employment decisions affecting the employee; or b. the individual has authority to direct the employee's daily activities." *EEOC Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors*, FEP Man. (BNA) 915.002 at 5 (Jun. 18, 1999).

> in harassment which results in an adverse "tangible employment action" against the employee, the employer is automatically held vicariously liable for the harassment. ... In contrast, when the supervisor's harassment involves no adverse "tangible employment action," an employer can avoid vicarious liability for the supervisor's conduct by raising and proving the affirmative defense described in the *Faragher* and *Ellerth* cases ("*Faragher/Ellerth* affirmative defense"). ...

*Frederick v. Sprint/United Management Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001) (citations

omitted).[161]

If the harassment culminates in an adverse, "tangible employment action," then the employer

is vicariously liable to the victimized employee. The employer is not entitled to assert an affirmative

defense.

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* Fed. Rule Civ. Proc. 8(c). ... No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Faragher*, 524 U.S. at 807-08, 118 S.Ct. at 2293; *see also Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2270

(same). Still, plaintiff must "present sufficient evidence to establish [a] causal link between the

adverse 'tangible employment action' she suffered and the alleged harassment." *Frederick*, 246

F.3d at 1312.

---

[161] *See also, e.g., Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1367 (11th Cir. 1999) (Barkett, J., concurring):

> To establish liability, the Supreme Court differentiated between cases in which an employee suffers and adverse "tangible employment action" as a result of sexual harassment and those cases in which an employee suffers the intangible harm of the indignity and humiliation caused by hostile work environment sexual harassment. In the former case the vicarious liability is established simply by proof of sexual harassment and the adverse tangible employment action taken by the supervisor. ... In the latter case — where no tangible employment action has been taken by the supervisor — the defending employer may interpose an affirmative defense to defeat liability. That affirmative defense "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." ... [Citations and footnote omitted.]

If the harassment did not culminate in an adverse, "tangible employment action," then "a plaintiff must present sufficient evidence to show that the harassment she suffered, objectively and subjectively, was severe or pervasive. ... If the plaintiff satisfies her burden, the defendant-employer is entitled to assert the *Faragher/Ellerth* affirmative defense." *Frederick*, 246 F.3d at 1313 (citations omitted).

> The defense comprises two necessary elements: (a) that the employer [*i*] exercised reasonable care to prevent and [*ii*] correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Faragher*, 524 U.S. at 807-08, 118 S.Ct. at 2293 (bracketed alterations added); *see also Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2270 (same).

"Both elements [of the affirmative defense] must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements." *Frederick*, 246 F.3d at 1313 (citations omitted).

> A court's assessment as to whether a defendant has proved this defense requires, first, an analysis of whether the employer has exercised reasonable care in *preventing* sexual harassing behavior. The court next directs its inquiry to whether the employee made reasonably sufficient use of available avenues to put the employer on notice of the problem. Finally, the court refocuses on the employer to determine whether the employer or its authorized agent, after receiving notice of the harassment, took adequate steps to abate it and prevent its recurrence.

*Coates*, 164 F.3d at 1369 (Barkett, J., concurring) (emphasis in original).[162]

---

[162] *See also* David A. Skidmore, Jr. & Andrew R. Kaake, *Sexual Harassment: The Supreme Court Couldn't*

The first element of the *Faragher/Ellereth* affirmative defense has two components, each requiring separate proof: (i) the employer must prove that it exercised reasonable care to *prevent* sexually harassing behavior in its workplace ("prevention prong"); and (ii) the employer also must prove that it exercised reasonable care to *correct promptly* any sexually harassing behavior occurring in its workplace ("remedial prong").

An employer does not satisfy the prevention prong of the first element of the affirmative defense simply by promulgating a policy prohibiting sexual harassment. *See Frederick*, 246 F.3d at 1314 ("an employer's showing that it has a sexual harassment policy does not automatically satisfy its burden").[163]

Rather, the employer must ensure that its policy is effectively disseminated to employees, *and*, that the policy's complaint procedures are"'designed to encourage victims of harassment to come forward [without requiring] a victim to complain first to the offending supervisor.'" *Faragher*, 524 U.S. at 806, 118 S.Ct. at 2292 (quoting *EEOC Policy Guidance on Sexual Harassment*, 8 FEP Manual 405:6699 (March 19, 1990)) (bracketed alteration in original); *see also Ellerth*, 524 U.S. at 764, 118 S.Ct. at 2270 (noting "EEOC's policy of encouraging the development of grievance procedures," and citing the same publication).

Indeed, in *Faragher*, the Supreme Court denied the defendant-employer recourse to the affirmative defense upon remand, because "the City had entirely failed to disseminate its policy

---

*Really Have Meant "And,"* 52 Labor L. J. 108, 114, 119 (2001) (commenting favorably on Judge Barkett's concurring opinion in *Coates*).

[163] *But see Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1297-98 (11th Cir. 2000), stating:

> When crafting the first prong of the *Faragher* affirmative defense which requires, in part, that the employer exercise reasonable care to prevent sexual harassment, the Supreme Court sought to give effect to Title VII's deterrent purpose. ... Accordingly, *the Supreme Court implied that employers could meet the initial burden in determining whether they had exercised reasonable care to prevent sexual harassment by promulgating an anti-harassment policy.* ... [Citations omitted; emphasis added.]

against sexual harassment among" the affected employees, and also because "the City's policy did not include any assurance that the harassing supervisors could be bypassed in registering complaints." *Faragher*, 524 U.S. at 808, 118 S.Ct. at 2293; *see also Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1299 (11th Cir. 2000) (concluding that the employer's complaint procedures met "the minimum requirements for the *Faragher* affirmative defense because the procedures did not require that the employee complain to the offending supervisor or through the supervisor's chain of command and the procedures provided multiple avenues of lodging a complaint to assessable, designated representatives"); *Coates*, 164 F.3d at 1369 (holding that a policy directing employees who had been sexually harassed to "immediately contact their line manager, Personnel Contact, or other manager with whom they feel comfortable" was a reasonable policy).

The remedial prong of the first element of the affirmative defense requires the employer to exercise reasonable care to promptly correct any sexually harassing behavior. "[A]n employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint." *Frederick*, 246 F.3d at 1314 (citing *Madray*, 208 F.3d at 1302).

The issue of whether an employer acted in a "reasonably prompt manner" to correct harassing behavior "turns on when it had proper notice of an employee's harassment complaint." *Frederick*, 246 F.3d at 1315; *see also Dees v. Johnson Controls World Services*, 168 F.3d 417, 422 (11th Cir. 1999) ("[T]he employer's notice of the harassment is of paramount importance [because] if the employer had notice of the harassment ... then it is liable unless it took prompt corrective action.").

"When an employer has a policy for reporting harassment that is clear and published to its employees, and an employee follows that policy, the employer's notice of the harassment is

40

established by the terms of the policy." *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th

Cir. 2000) (citing *Coates*, 164 F.3d at 1364 (holding that when a company has "clearly specified the

steps a victimized employee should take to alert the employer of harassment," then the company

"itself answered the question of when it would be deemed to have notice of the harassment sufficient

to obligate it or its agents to take prompt and appropriate remedial measures")); *see also Madray*,

208 F.3d at 1300 (same).

Careful analysis of the remedial prong reveals that it also has two facets, and that the first

images the second element of the *Faragher/Ellerth* affirmative defense. In other words, a district

court must initially determine whether *the victimized employee* "made reasonably sufficient use of

the channels created by [the employer's] policy to put [the employer] on notice of the ongoing

harassment." *Coates*, 164 F.3d at 1364. This prefigures the second element of the affirmative

defense. "The sole inquiry when the employer has a clear and published policy is whether the

complaining employee followed the procedures established in the company's policy." *Breda*, 222

F.3d at 890.

Thus, it is only when the court determines that adequate notice of the harassment *was given*

by the complaining employee in accordance with the employer's policy that the court may proceed

to a second level of inquiry — that of determining whether the employer took reasonably prompt

and appropriate remedial action. *Coates*, 164 F.3d at 1364.

If an employer promulgates and effectively disseminates a sexual harassment policy

designed to encourage victims of harassment to come forward, by allowing victims to bypass

offending supervisors, then "it is incumbent upon the employees to utilize the procedural

mechanisms established by the company specifically to address problems and grievances." *Madray*,

208 F.3d at 1300 (quoting *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir.

1997)); *see also Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997) (noting that, when an

employer has identified and appointed a recipient for sexual harassment complaints, "complainants

can be expected to utilize it").

> We are not unmindful of the enormous difficulties involved in lodging
> complaints about discrimination in the workplace, including complaints of sexual
> harassment. We also recognize the great psychological burden it places on one who
> is already the victim of harassment to require that person to complicate further his
> or her life with the ramifications, both legal and otherwise, of making a complaint.
> Federal law has now attempted to correct the problem of workplace discrimination,
> *but it cannot be done without the cooperation of the victims, notwithstanding that it
> may be difficult for them to make such efforts.* When an employer has taken steps,
> such as promulgating a considered sexual harassment policy, to prevent sexual
> harassment in the workplace, *an employee must provide adequate notice that the
> employer's directives have been breached* so that the employer has the opportunity
> to correct the problem.

*Coates*, 164 F.3d at 1366 (emphasis supplied).

Consequently, if a plaintiff lodges complaints to individuals not designated by the employer

to receive or process sexual harassment complaints, the employer cannot be considered to have been

placed on notice of harassing behavior. *See Madray*, 208 F.3d at 1300. Moreover,

> while proof that an employee failed to fulfill the corresponding obligation of
> reasonable care to avoid harm is not limited to showing an unreasonable failure to
> use any complaint procedure provided by the employer, demonstration of such
> failure will normally suffice to satisfy the employer's burden under the second
> element of the defense.

*Faragher*, 524 U.S. at 807-08, 118 S.Ct. at 2293; *see also Ellerth*, 524 U.S. at 765, 118 S.Ct. at

2270; *Frederick*, 246 F.3d at 1314 ("an employer's showing that the plaintiff-employee failed to

follow its complaint procedures will often be sufficient to satisfy its burden").

However, if the plaintiff demonstrates that her failure to comply with the employer's

complaint procedures was reasonable under the circumstances — such as by showing that she never

received a copy of the employer's written policy, or that the stated procedures for reporting a

complaint were not clear, or that she was dissuaded by a manger or supervisor from lodging a complaint — the defendant cannot satisfy the second element of the affirmative defense. *Frederick*, 246 F.3d at 1314, 1315-16.

Finally, if the harasser was on the other end of the status continuum, and merely plaintiff's co-worker, then the employer's liability is judged by a negligence standard — that is, a plaintiff must prove that the employer either knew, or should have known of the alleged harassment, but failed to take prompt and appropriate remedial action. *See, e.g., Faragher*, 524 U.S. at 799, 118 S.Ct. at 2289 (collecting cases); *Ellerth*, 524 U.S. at 759, 118 S.Ct. at 2267 ("Negligence sets a minimum standard for employer liability under Title VII."); *see also, e.g., Succar v. Dade County School Board*, 229 F.3d 1343, 1344-45 (11th Cir. 2000) (per curiam) (holding that a plaintiff asserting a "hostile work environment" sexual harassment claim on the basis of co-worker conduct must prove "that the employer knew or should have known of the harassment and failed to intervene"); *Breda*, 222 F.3d at 889 ("Employer liability in a case involving sexual harassment by a co-worker exists when the employer knew (actual notice) or should have known (constructive notice) of the harassment and failed to take remedial action."); 29 C.F.R. § 1604.11(d) (1997) (an employer is liable for co-worker harassment if it "knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action").

Under the law of the Eleventh Circuit as it existed prior to the 1997-98 term of the Supreme Court, it was said that a plaintiff could demonstrate that an employer possessed constructive knowledge of harassment "by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge," or actual knowledge "by showing that she complained to *higher management* of the harassment." *Henson*, 682 F.2d at 905 (emphasis supplied).

As a consequence of the Supreme Court's simultaneous decisions in *Faragher* and *Ellerth*, however, "the difference, if any, between [lodging a complaint with] a supervisor who is part of 'higher management' and one who is not, is no longer relevant for purposes of employer Title VII liability." *Coates*, 164 F.3d at 1367 (Barkett, J., concurring).

Indeed, when an employer promulgates and effectively disseminates a clear policy for reporting sexual harassment, the employer's knowledge of the offensive conduct is established by the terms of the policy under the same principles discussed above. *See Breda*, 222 F.3d at 889 (holding in the context of co-worker harassment that, "if an employer has a company policy specifically designating the person or persons to whom an employee should report instances of suspected sexual harassment, once the employee complains to the designated person or persons, the employer is deemed to have actual notice of the harassment").

**B.     Application of General Principles to Plaintiff's Sexual Harassment Claims**

    **1.     Foster Drummonds**

Foster Drummonds qualified as plaintiff's supervisor at all times relevant to the present action, because the only harassment by Drummonds that occurred after he ceased to exercise supervisory authority over her (July 9, 1998) culminated in plaintiff being denied the position of head of housekeeping at the new Kennedy School, which arguably constituted an adverse, "tangible employment action." *See Llampallas*, 163 F.3d at 1247 n.20 (stating that the term "supervisor" is "rather superfluous" whenever the plaintiff's action is "based on a tangible employment action.") (The adverb "arguably" was used intentionally in the preceding sentence, because plaintiff failed to define the material distinctions between her present job and the head of housekeeping position, other than saying the latter paid "more money."[164]  Exactly how much "more" she did not say.)

---

[164] Defendant Pell City Board of Education's evidentiary submission (doc. no. 30), Exhibit 10 (plaintiff's first

Even so, plaintiff still has failed to establish a prima facie case, because she has not established a causal linkage between her failure to be selected for that position and Drummonds' harassing conduct. The only evidence that plaintiff presented on this point was her testimony that she was not hired after she rebuffed Drummonds' request to take off her clothes and show him her body at the Kennedy School construction site. This testimony is insufficient to survive defendant's motion for summary judgment, because the Board offered unrebutted evidence that plaintiff was not offered the housekeeping position due to the Board's policy prohibiting employees from concurrently holding more than one full-time position.[165] *See Frederick*, 246 F.3d at 1312 (finding that employer's unrebutted evidence that adverse "tangible employment action" was not causally linked to alleged harassment entitled employer to summary judgment). Although plaintiff argues in her brief that she "could" have given up her bus route for the housekeeping position,[166] there is *no evidence* that she either intended or offered to do so. Accordingly, summary judgment is due to be granted in favor of the Board on this claim.

None of the remaining acts of harassment attributed to Foster Drummonds culminated in an adverse, "tangible employment action." Further, the court concludes that the Board exercised reasonable care to prevent and correct promptly any sexually harassing behavior, while plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities provided by the Board. *Faragher*, 524 U.S. at 807-08, 118 S.Ct. at 2293.

The Board took reasonable care to prevent any sexually harassing behavior by adopting an anti-harassment policy containing a complaint procedure "designed to encourage victims of harassment to come forward [without requiring] a victim to complain first to the offending

---

deposition), at 136.

[165] *See supra* notes 65-67 and accompanying text.

[166] *See supra* note 66.

supervisor." *Id.* at 806, 118 S.Ct. at 2292. Plaintiff's testimony that the Board provided drivers with an employee handbook containing a copy of the policy at the beginning of each school year demonstrates that the policy was adequately disseminated. Moreover, plaintiff admitted that she read the policy during the 1997-98 and 1998-99 school years.

Plaintiff's unexplained failure to follow the policy's complaint procedures establishes her failure to take advantage of any preventive or corrective opportunities provided by the Board. Although Drummonds' harassing conduct began in 1997, plaintiff did not complain to "the next higher level of supervision" *and* "the Superintendent" as required by the Board's complaint procedure[167] until September 16, 1998, when she first complained to Della Baker about "unwanted attention" from Billy Adams. On September 22, 1998, six days after complaining to Baker, plaintiff was interviewed by Baker and Deloris Frazier as part of an investigation into plaintiff's sexual harassment complaint. Curiously, plaintiff failed to mention Drummonds' harassing conduct in either her September 22, 1998 interview, or the handwritten statement she submitted to Baker on September 18, 1998. Likewise, plaintiff's August 11, 1998 EEOC charge failed to describe Foster Drummonds' objectionable conduct. Although plaintiff insists that she reported Drummonds' harassment to Dr. Billy Pack, that complaint failed to put the Board on notice because the offensive conduct about which she complains in this suit began in 1997, long after Dr. Pack's employment with the Board had ended.[168]

The Board exercised reasonable care to promptly correct the harassing conduct complained of by plaintiff. The Board's investigation had the desired effect: plaintiff experienced no further harassment from any employee of the Board after September 22, 1998. Further, upon receiving

---

[167] *See* text at note 36 *supra* (Board's policy).

[168] *See supra* notes 40-42 and accompanying text.

46

plaintiff's affidavit on March 15, 1999, containing explicit details of Drummonds' harassment, the Board promptly conducted another investigation. On the date this affidavit was received by the Board, however, Drummonds was not at work: he had been on medical leave since January 19, 1999, following back surgery. He never returned to work for the Board.

### 2.    Lewis Kirksey

Lewis Kirksey did not qualify as plaintiff's supervisor at any time relevant to the present action, because he did not exercise control over plaintiff's daily activities or duties, nor did he have the power to hire, fire, demote, promote, transfer, or discipline plaintiff.[169] Although Kirksey supervised bus drivers on those (unspecified number of) occasions that he drove a bus to school football games, that is not sufficient to implicate the supervisory principles of the *Faragher/Ellerth* analytical framework.

Plaintiff has failed to establish a prima facie case of sexual harassment with regard to Kirksey, because she has failed to prove that the Board knew, or should have known of Kirksey's harassment, but failed to take prompt and appropriate remedial action. In order to establish that the Board had knowledge of Kirksey's harassing conduct, plaintiff must demonstrate that she complied with the reporting requirements of the Board's anti-harassment policy. *Breda*, 222 F.3d at 889. "The sole inquiry when the employer has a clear and published policy is whether the complaining employee followed the procedures established in the company's policy." *Id.* at 890.

Although plaintiff complained about Lewis Kirksey's encouragement of Billy Adams' behavior to Della Baker and Deloris Frazier during her September 22, 1998 interview, the Board did not receive notice of Kirksey's individual acts of harassment until Dr. Nicholson received a copy of plaintiff's EEOC charge on October 12, 1998. Della Baker and Deloris Frazier promptly

---

[169] *See supra* note 160.

conducted an investigation into the allegations contained in plaintiff's EEOC charge. Plaintiff, however, refused to cooperate with the investigation. Baker and Frazier nevertheless interviewed Lewis Kirksey, John Hendrix, Lester Rich, Foster Drummonds, Bonnie Howell, and Danny Howell on October 14, 1998. Based on those interviews alone, however, Frazier and Baker were unable to substantiate plaintiff's allegations. In any event, the Board's September 22, 1998 and October 14, 1998 investigations had the desired effect: plaintiff experienced no further harassment from any employee of the Board.

### 3.    Billy Adams

It is undisputed that Billy Adams merely was plaintiff's co-worker.

Plaintiff has failed to establish a prima facie case of sexual harassment with regard to Adams, because she has failed to prove that the Board knew, or should have known of Adams' harassment, but failed to take prompt and appropriate remedial action. Once again, in order to establish that the Board had knowledge of Adams' harassing conduct, plaintiff must demonstrate that she complied with the reporting requirements of the Board's anti-harassment policy. *Breda*, 222 F.3d at 889-90.

Although plaintiff complained to Lewis Kirksey and Foster Drummonds of Adams' harassing conduct in 1997 and early 1998, the Board did not receive notice of Adams' conduct until September 16, 1998, when plaintiff finally complained to Della Baker. Even then, plaintiff only partially complied with policy requirements: *i.e.*, she did not report her complaint to the Superintendent.[170] *Drummonds*, of course, was plaintiff's immediate supervisor until July 9, 1998. Even so, the Board's anti-harassment policy required plaintiff to go around him, and report Adams' harassing behavior to "the next higher level of supervision" *and* "the Superintendent," because Drummonds' himself was sexually harassing plaintiff in 1997 and 1998. Although plaintiff insists

---

[170] *See* text at note 36 *supra* (Board's policy).

that she reported Adams' harassment to Dr. Billy Pack, that complaint failed to put the Board on notice, because the offensive conduct about which she complains in this suit began in 1997, after Dr. Pack's employment with the Board had ended.

Following plaintiff's complaint to Della Baker, the Board took prompt and appropriate remedial action. Dr. Nicholson suspended Adams on September 28, 1998. The following day, Adams resigned. He has not been employed by the Board since that date.

## C.   Retaliation

A plaintiff must prove three elements to establish a prima facie case of retaliation:  (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; (3) there was a causal linkage between the protected activity and the adverse employment action. *See, e.g.*, *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Gupta*, 212 F.3d at 587; *Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998); *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

It is undisputed that plaintiff engaged in statutorily protected activity by filing an EEOC charge on August 11, 1998, and by complaining to Della Baker on September 16, 1998.

With respect to the second element, plaintiff points to the following actions, all taken after she filed her EEOC complaint:  (1) on one occasion, Della Baker wrote up plaintiff for missing her afternoon bus route without providing adequate notice; (2) Ms. Baker asked mechanics to stay away from plaintiff; (3) on one occasion, Dr. Nicholson boarded plaintiff's bus to discipline a group of unruly students; (4) Dr. Nicholson thereafter asked two school principals to "check up" on the behavior of students riding on plaintiff's bus, and, equipped plaintiff's bus with a video camera; (5)

49

Ms. Baker failed to promptly post a memo in the bus shop requesting employees to contribute money toward purchasing plaintiff flowers while in the hospital; (6) Ms. Baker did not respond appropriately to plaintiff's complaint that Robin Calhoun and Lewis Kirksey were not making her feel "included" when driving on field trips; (7) Dr. Nicholson suspended plaintiff with pay while investigating her altercation with Robin Calhoun; and (8) plaintiff has been asked to drive less frequently on field trips.

As previously discussed, "[a]n adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta*, 212 F.3d at 587. "Conduct that falls short of an ultimate employment decision must meet 'some threshold level of substantiality ... to be cognizable under the anti-retaliation clause'" of Title VII. *Id.* (quoting *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998)). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996).

On the other hand, conduct that alters an employee's compensation, terms, conditions, or privileges of employment constitutes an actionable adverse action. *See, e.g., Graham v. State Farm Mutual Insurance Co.*, 193 F.3d 1274, 1283 (11th Cir. 1999); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997). "Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined on a case-by-case basis, ... using both a subjective and objective standard." *Gupta*, 212 F.3d at 587 (citations omitted).

None of the listed actions constitute adverse employment actions. None, regardless of whether considered individually or in combination, was objectively serious enough to alter

plaintiff's "compensation, terms, conditions, or privileges of employment, [or] deprive ... her of employment opportunities, or adversely affect ... her status as an employee." *Id.* "Title VII [] is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) (citation omitted).

The only action that arguably merits discussion is plaintiff's suspension. However, there is not a scintilla of evidence in the record suggesting, much less establishing, that plaintiff's suspension adversely affected her employment in any way. Plaintiff was suspended for five days, but she received full pay the entire time.

Plaintiff thus has failed to establish a prima facie case with regard to any of her claims for retaliation.

## IV. CONCLUSION

For the foregoing reasons, the Board's motion for summary judgment is due to be granted on all of plaintiff's sexual harassment and retaliation claims. With the dismissal of plaintiff's Title VII claims, the basis for this court's exercise of original jurisdiction disappears. The court, therefore, exercises its discretion and dismisses plaintiff's remaining state law claims without prejudice to her right to assert them in an appropriate state forum. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction ...."); *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7, 108 S.Ct. 614, 619 n.7, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise supplemental jurisdiction over the remaining

state-law claims.").

An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this __23rd__ day of October, 2001

United States District Judge